Search Warrant

# UNITED STATES DISTRICT COURT
for the
District of Arizona

In the Matter of the Search of
*(Briefly Describe the property to be searched or identify the person by name and address*
Information associated with cellular telephone device
International Mobile Equipment Identity number
355127090555023.

Case No.  21-200 MB

## SEARCH AND SEIZURE WARRANT

To:     Any authorized law enforcement officer

An application by a federal law enforcement officer or an attorney for the government requests the search of the following person or property located in the District of _____Arizona_____.
(identify the person or describe the property to be searched and give its location):

**As further described in Attachment A.**

The person or property to be searched, described above, is believed to conceal (identify the person or describe the property to be seized):

**As set forth in Attachment B.**

I find that the affidavit(s), or any recorded testimony, establish probable cause to search and seize the person or property.

YOU ARE COMMANDED to execute this warrant on or before ____July 26, 2021____.
*(not to exceed 14 days)*

☒ in the daytime 6:00 a.m. to 10 p.m.
☐ at any time in the day or night as I find reasonable cause has been established.

Unless delayed notice is authorized below, you must give a copy of the warrant and a receipt for the property taken to the person from whom, or from whose premises, the property was taken, or leave the copy and receipt at the place where the property was taken.

The officer executing this warrant, or an officer present during the execution of the warrant, must prepare an inventory as required by law and promptly return this warrant and inventory to the United States Magistrate Judge on duty in the District of Arizona.

N/A     ☐ I find that immediate notification may have an adverse result listed in 18 U.S.C. § 2705 (except for delay of trial), and authorize the officer executing this warrant to delay notice to the person who, or whose property, will be searched or seized (*check the appropriate box*)     ☐ for 30 days (*not to exceed 30*)
☐ until, the facts justifying, the later specific date of _____.

Date and time issued: __July 12, 2021 @ 1:30pm__   __Michelle Burns__
*Judge's signature*

City and State: __Phoenix, Arizona__     __Honorable Michelle H. Burns, U.S. Magistrate Judge__
*Printed name and title*

AO 93 (Rev. 01/09) Search and Seizure Warrant (Page 2)

## RETURN

| Case No.: | Date and Time Warrant Executed: | Copy of warrant and inventory left with: |
|---|---|---|
| | | |

Inventory Made in the Presence of:

Inventory of the property taken and name of any person(s) seized:

## CERTIFICATION

I declare under penalty of perjury that this inventory is correct and was returned along with the original warrant to the designated judge.

Date: _____

_____
Executing officer's signature

_____
Printed name and title

## ATTACHMENT A

### Property to Be Searched

This warrant applies to a BLU C5 cellular telephone number with International Mobile Equipment Identity 355127090550023, which was associated with cellar telephone numbers (928) 206-1308 and (928) 206-0708 (the "TARGET TELEPHONE"). The TARGET TELEPHONE was used by JOSEPH and believed to be in his possession.

## ATTACHMENT B

All information described above in Section I that constitutes evidence, fruits, contraband, and instrumentalities of violations of 18 U.S.C. § 2241, Aggravated Sexual Assault, and 18 U.S.C. § 2243(a) as described in the Affidavit.

1. Telephone numbers of incoming/outgoing calls stored in the call registry;

2. Telephone numbers and corresponding names to those numbers stored in the cellular telephone's address book;

3. Any incoming/outgoing text messages;

4. Telephone subscriber information; and

5. Any other electronic information in the stored memory and/or accessed by the active electronic features of the digital or cellular telephone or SIM Card, including but not limited to e-mail, voicemail, and photos.

# UNITED STATES DISTRICT COURT
for the
District of Arizona

| | |
|---|---|
| In the Matter of the Search of<br>*(Briefly Describe the property to be searched or identify the person by name and address)*<br><br>Information associated with cellular telephone device International Mobile Equipment Identity number 355127090555023 | Case No.   21.200 MB |

## APPLICATION AND AFFIDAVIT FOR A SEARCH WARRANT

I, SA Dustin Blazer Drace, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property (*identify the person or describe the property to be searched and give its location*):

### As further described in Attachment A.

Located in the District of __Arizona__, there is now concealed (*identify the person or describe the property to be seized*):

### As set forth in Attachment B.

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:
- ☒ evidence of a crime;
- ☐ contraband, fruits of crime, or other items illegally possessed;
- ☐ property designed for use, intended for use, or used in committing a crime;
- ☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code/Section | Offense Description |
|---|---|
| 18 U.S.C. §2241 | Aggravated Sexual Abuse |
| 18 U.S.C. §2243(a) | Sexual Abuse of a Child |

The application is based on these facts:
### As set forth in Attachment C, incorporated herein by reference.

☒ Continued on the attached sheet.
☐ Delayed notice of ___ days (give exact ending date if more than 30 days: _____) is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

Reviewed by AUSA
*Sworn Telephonically*

_____
*Applicant's Signature*

Dustin Blazer Drace, SA, FBI
*Applicant's printed name and title*

Date issued: __July 12, 2021__

_____
*Judge's signature*

City and State: __Phoenix, Arizona__

Honorable Michelle H. Burns, U.S. Magistrate Judge
*Printed name and title*

## ATTACHMENT A

### Property to Be Searched

This warrant applies to a BLU C5 cellular telephone number with International Mobile Equipment Identity 355127090550023, which was associated with cellar telephone numbers (928) 206-1308 and (928) 206-0708 (the "TARGET TELEPHONE"). The TARGET TELEPHONE was used by JOSEPH and believed to be in his possession.

**ATTACHMENT B**

All information described above in Section I that constitutes evidence, fruits, contraband, and instrumentalities of violations of 18 U.S.C. § 2241, Aggravated Sexual Assault, and 18 U.S.C. § 2243(a) as described in the Affidavit.

1. Telephone numbers of incoming/outgoing calls stored in the call registry;

2. Telephone numbers and corresponding names to those numbers stored in the cellular telephone's address book;

3. Any incoming/outgoing text messages;

4. Telephone subscriber information; and

5. Any other electronic information in the stored memory and/or accessed by the active electronic features of the digital or cellular telephone or SIM Card, including but not limited to e-mail, voicemail, and photos.

**ATTACHMENT C**

**AFFIDAVIT IN SUPPORT OF AN APPLICATION FOR**

**A SEARCH WARRANT**

I, Dustin Blazer Drace, a Special Agent with the Federal Bureau of Investigation ("FBI"), being duly sworn, depose and state as follows:

**INTRODUCTION AND AGENT BACKGROUND**

1.     The facts of this case, as more fully detailed herein, are that on unspecified dates but on numerous occurrences within the confines of the Navajo Nation Indian Reservation within the District of Arizona, CECIL JOSEPH (hereinafter JOSEPH) sexually assaulted then minors, CA.J. JANE DOE, JL.J, and JD.J, all enrolled members of the Navajo Nation Indian Tribe, in violation of Title 18, United States Code, §§ 1153 and 2241- Aggravated Sexual Abuse and Sexual Abuse of a Child in violation of Title 18, United States Code, §§ 1153 and 2243(a). I make this affidavit in support of an application for a search warrant for information and items associated with the physical cellular telephone, International Mobile Equipment Identity number 355127090550023, which was described as a BLU C5 handset and was associated with cellular numbers (928) 206-1308 and (928) 206-0708, (hereinafter the Target Telephone), believed to be used by JOSEPH, that is currently in the possession of JOSEPH. Accordingly, this application requests authority to search for evidence of these crimes on the Target Telephone, as described in Attachment A for evidence of these crimes, as described in Attachment B.

2.     I am a Special Agent of the Federal Bureau of Investigation (hereinafter FBI) and have been since January 2018. I am currently assigned to the Gallup, New Mexico, Resident Agency of the Phoenix, Arizona, FBI Field Division. I have received training at the Federal Bureau of Investigation Training Academy in Quantico, Virginia, as well as training in the investigation of crimes against children and other violent crimes. In the course of my official duties, I am charged with the investigation of crimes occurring on (among other places) the Navajo Nation Indian Reservation within the Federal District of Arizona. I am an investigative law enforcement officer of the United States, and I am empowered by law to conduct

investigations and to make arrests for offenses enumerated in Title 18 of the United States Code.

3.      I have been trained in various aspects of law enforcement, including searching and seizing digital media to include telephone and social media content.  In addition, I have been involved in multiple investigations in which digital media, including telephones and social media accounts, have been seized, searched, and forensically examined.

4.      The facts in this affidavit come from my personal observations, my training and experience, and information obtained from other agents, officers, investigators, and witnesses.  This affidavit is intended to show merely there is sufficient probable cause for the requested warrant and does not set forth all my knowledge about this matter.  I have set forth only the facts I believe are necessary to establish probable cause to believe evidence of a violation of Title 18, United States Code, §§ 1153, 2241, and 2243(a), is located on the device, the Target Telephone, that is in possession of JOSEPH, as described in Attachment A, for evidence of this crime as described in Attachment B.

## PROBABLE CAUSE

5.      On October 2, 2020, the FBI – Gallup Resident Agency received information from the Navajo Nation Police Department (hereinafter NNPD) that A.C., the mother of minor JANE DOE, age seven, reported that her grandmother's boyfriend, JOSEPH touched her "where she didn't want to be touched".  JOSEPH was the boyfriend of L.S., the grandmother of JANE DOE.  A.C. became aware of the incident after JANE DOE was having trouble sleeping and experiencing nightmares.  A.C. determined through discussion with JANE DOE that an incident occurred with JOSEPH while JANE DOE was at L.S.'s residence.

### Forensic Interview of JANE DOE

6.      On October 27, 2020, JANE DOE was interviewed by a forensic interviewer at the Hummingbird Child Advocacy Center located in Gallup, New Mexico.  The interview was audio and video recorded.  JANE DOE disclosed the following information:

7.     JANE DOE was seven years old at the time of the interview. JANE DOE disclosed that on an when she was 5 years old or in first grade, she was sitting on the far end of the sofa at L.S.'s residence located in Ganado, Arizona. JOSEPH snuck up behind JANE DOE and touched her "here" and on the shoulder. Upon stating "here", JANE DOE appeared to demonstrate that she was referring to her groin area. Upon questioning from the interviewer, JANE DOE clarified that she was referring to her "private part". JANE DOE disclosed that JOSEPH touched her private part over her clothing, which was a dress. JOSEPH stopped when JANE DOE went to tell L.S. JOSEPH left L.S.'s residence the next day.

8.     JANE DOE advised that A.C. informed her that JANE DOE'S, sister JD.J. was sexually assaulted when JANE DOE was a baby.

## Forensic Interview of JD.J.

9.     On December 30, 2020, JD.J. was interviewed by a forensic interviewer at the Hummingbird Child Advocacy Center located in Gallup, New Mexico. The interview was audio and video recorded. JD.J. disclosed the following information:

10.    At the time of the interview, JD.J. was 17 and a senior in high school. JD.J. lived at the residence of L.S. approximately four or five years prior to the interview. JD.J. knew she was being interviewed because of incidents that occurred with JOSEPH, whom JD.J. knew as L.S.'s boyfriend.

11.    JD.J. disclosed when she was approximately thirteen or in 7th grade, she was touched inappropriately by JOSEPH for the first time. JOSEPH wanted to drive from Ganado to Gallup. L.S. told JD.J. to go with JOSEPH. JOSEPH drove L.S.'s silver Nissan Rogue. JD.J. and JOSEPH were alone in the vehicle.

12.    JOSEPH and JD.J. stopped at a Speedway gas station located near Fort Defiance, Arizona. JOSEPH went into the gas station to get food. When JOSEPH got back to the vehicle, he put his hands in JD.J.'s shirt and touched her breasts under bra. JD.J. told JOSEPH to stop and that she didn't like it. JOSEPH asked if JD.J. wanted him to drive somewhere so she could take her clothes off for him. JD.J. told JOSEPH she did not want to.

13.     JD.J. disclosed that JOSEPH put his hand inside her pants.  JOSEPH grabbed JD.J. and kissed her neck and breasts.  JD.J. also disclosed that JOSEPH tried to put his fingers inside JD.J.'s vagina and it hurt.  JD.J. told JOSEPH to stop and that she was going to tell L.S.  JD.J. never told her grandmother what JOSEPH did because she was scared L.S. would not believe her and that JD.J. would get in trouble.

14.     On another occasion when JD.J. was approximately thirteen, JD.J. disclosed that she was at L.S.'s residence where she lived with her sister JANE DOE.  L.S. was at work.  JOSEPH came over to L.S.'s house to check on JD.J. and JANE DOE.  JD.J. recalled that JOSEPH was wearing his beige work pants, a gray and black security shirt, and a security jacket.

15.     JD.J. disclosed that JOSEPH pushed her into a back bedroom.  He was strong and pushed JD.J. onto the bed.  JOSEPH took off JD.J.'s pant, kissed her breasts and vagina.  JOSEPH took off his pants and put his penis inside JD.J.'s vagina.  He asked if she liked it.

16.     JOSEPH stopped when he saw JD.J. bleeding.  JD.J. went to her room because she was bleeding and was in pain.  JOSEPH put on his clothes and went to work.  JOSEPH told JD.J. not to tell L.S. because L.S. would get mad.  JD.J. told L.S., but L.S. did nothing about it.

17.     On June 19, 2021, JD.J. was interviewed by Special Agent Drace.  JD.J. advised that she and JOSEPH exchanged text messages and phone calls between June 2020 and October 2020.  JOSEPH usually initiated the communication.  He asked JD.J. how she was doing and about her upcoming basketball or softball games.  JD.J. only ever texted or called JOSEPH to ask for money or to see if he was with L.S.  JD.J. did not discuss anything sexual in nature with JOSEPH via cellular telephone call or via text message.  JD.J. did not tell JOSEPH to delete his text messages.

18.     JD.J. did not offer to have sex with JOSEPH in exchange for money.  JD.J. asked for money to do activities with friends, for snacks, or for her trips for basketball. She asked other family members for money first.  JD.J. would offer to do chores for L.S. or C.J. in exchange for money.  L.S. was on a tight budget and wasn't usually able to give JD.J. more than five dollars.  C.J. took care of JD.J., her siblings JL.J. and JOHN DOE, as well as C.J.'s own children, so she usually did not have money to give JD.J.

JOSEPH was always the last person JD.J. asked for money and he always gave it to her.   JOSEPH told JD.J., "Any time you need something, you come to me."   JD.J. never did chores or provided favors to JOSEPH for money.

## Forensic Interview of JOHN DOE

19.    On January 6, 2021, JOHN DOE was interviewed by a forensic interviewer at the Hummingbird Child Advocacy Center located in Gallup, New Mexico.  The interview was audio and video recorded.  JOHN DOE disclosed the following information.

20.    JOHN DOE was 17 years old at the time of the interview.  JOHN DOE is the brother of JD.J. and JL.J. They lived together at the residence of L.S. during unspecified dates for an unspecified amount of time.

21.    When JOHN DOE was approximately eleven or twelve years old, or in 5th grade, he saw JOSEPH try to touch JD.J.  JOHN DOE and was sitting in the rear middle passenger seat of a vehicle. JOSEPH was driving a gray Nissan from Klagetoh, Arizona to Ganado and JD.J. was riding in the front passenger seat.  JOSEPH put his hand on JD.J.'s thigh.  JD.J. told JOHN DOE to tell JOSEPH to stop. JOSEPH stopped putting his hand on JD.J.'s thigh for approximately a minute, but he tried to put his hand on her thigh again.  JD.J. kept pushing JOSEPH's hand away.

22.    JOHN DOE disclosed that JD.J. always wanted JOHN DOE to be around when JOSEPH was near.  JD.J. told JOHN DOE that when she was with JOSEPH or when JD.J. and JOSEPH were alone in the car, JOSEPH tried to touch her.  JD.J. didn't specify where JOSEPH tried to touch her.  JOHN DOE knew other things were happening, but he didn't see them.  JL.J. told JOHN DOE that JOSEPH touched her too, but she didn't tell him until approximately a year after she moved away from L.S.'s residence.

## Forensic Interview of JL.J.

23.    On January 8, 2021, JL.J. was interviewed by a forensic interviewer at Childhelp located in Phoenix, Arizona.  The interview was video, and audio recorded.  JL.J. provided the following information:

24.     JL.J. disclosed repeated incidents of unwanted touching by JOSEPH, who she knew as L.S.'s former boyfriend.  On multiple occasions, JOSEPH grabbed JL.J.'s breasts, put his hand on her lower back and buttocks, and touched the back of her legs.  JOSEPH would hug JL.J. and would not let go when she wanted him to.

## Interview of L.S.

25.     On February 25, 2021, L.S. was interviewed by SA Drace and Navajo Department of Criminal Investigations Investigator Fayetta Dale (hereinafter CI Dale).  L.S. provided the following information:

26.     L.S. and JOSEPH were together since approximately 2006, though she hadn't seen him for approximately six months at the time of the interview.  They were drifting apart.  L.S. used to live with JOSEPH at his residence near Klagetoh until her mother had a stroke in 2010.  L.S. moved to her mother's residence in Ganado until 2013 when L.S. purchased her current residence in Ganado.

27.     L.S.'s grandchildren JD.J., JL.J., and JOHN DOE lived with their father and their stepmother before they lived with L.S.  They lived with L.S. for approximately two years.  JL.J., JD.J., and JOHN DOE went to live with their aunt CH.J. after they left L.S.'s residence.  JL.J. left first before she was 18.  JD.J. and JOHN DOE left in approximately July 2019.  JD.J. and JL.J. left because of some arguments they had with L.S., but L.S. did not remember what the arguments were about.

28.     After L.S. moved out of JOSEPH's residence in Klagetoh, JOSEPH spent the night off and on at L.S.'s residence in Ganado to be closer to work.  JD.J. would babysit JANE DOE by herself when L.S. was at work.  L.S. knew JOSEPH would go to her residence when she was not there.  JOSEPH would not tell L.S. he went to her home, but sometimes he would tell her afterward that he stopped by.  L.S. denied knowing of a time where JOSEPH sexually assaulted JD.J. at her residence.

29.     JD.J. previously told L.S. that she didn't like the way JOSEPH treated her or touched her.  L.S. denied that JD.J. detailed any specific interactions with JOSEPH.  Approximately one year prior to the interview, CH.J. told L.S. that JD.J. disclosed that JOSEPH touched her inappropriately.

30.     Sometime after 2013, JOSEPH drove L.S.'s truck to Phoenix with JD.J. in the middle front bench seat and L.S. in the front passenger seat. L.S. saw JOSEPH put his hand on JD. J's leg. JD.J. looked at L.S. and L.S. knew from the look that JD.J. was uncomfortable. L.S. told JOSEPH to pull over and she switched seats with JD.J. L.S. was uncomfortable with the way JOSEPH touched JD.J. L.S. later asked JOSEPH why he touched JD.J. and JOSEPH advised he didn't know. L.S. advised JOSEPH it was inappropriate for him to do that to JD.J.

31.     JD.J., JL.J., and JOHN DOE would ride in the car with JOSEPH frequently. L.S. denied knowing about any time when JOSEPH touched JD.L. or JL.J. inappropriately. L.S. did not know why JD.J. would be afraid to tell L.S. about what happened with JOSEPH. L.S. told her grandchildren that if something was going on, they could tell her.

32.     In approximately October 2020, A.C. advised L.S. that JANE DOE was having nightmares and was going to speak to someone because of some things that happened at L.S.'s residence. A.C. didn't provide additional information. L.S. didn't know anything else and did not know of JOSEPH touching JANE DOE inappropriately.

33.     L.S. denied knowing of any instance where JOSEPH sexually assaulted JL.J. JOSEPH tried to develop a grandfatherly relationship with L.S.'s grandchildren. JOSEPH appeared to have a good relationship with JD.J. and JL.J. JOSEPH would tell L.S. that "the girls" stopped by to see him at work and he would give them money when they asked. L.S. did not have any reason to believe that JD. J or JL. D would lie about any incident that occurred with JOSEPH. L.S. advised that JOSEPH still lived at his residence near Klagetoh and provided cellular telephone number (928) 206-1308 as the contact telephone number for JOSEPH.

**Interview of CECIL JOSEPH**

34.     On February 25, 2021, JOSEPH was interviewed by SA Drace and CI Dale. JOSEPH lived on the Navajo Nation Indian reservation in Klagetoh, Arizona his entire life. JOSEPH confirmed that he

was an enrolled member of the Navajo Nation. Your affiant received a copy of JOSEPH's Certificate of Indian Blood from the Navajo Nation Office of Vital Records and Identification.

35.     JOSEPH was with L.S. for approximately 12 or 13 years. He advised that he has not seen L.S. for approximately five months. JOSEPH did not live with L.S. in Ganado, but he would spend time with her and help take care of her residence.

36.     JOSEPH was familiar with L.S.'s grandchildren JANE DOE, JL.J., JD.J., and their brother whom JOSEPH knew by his nickname. JD.J., JL.J., and JOHN DOE lived with L.S. when they were teenagers. He did not know why they left L.S.'s residence, but was not familiar with any issues between them and L.S.

37.     JOSEPH was not aware of an accusation made by JANE DOE that JOSEPH touched her inappropriately. L.S. was always around when he was with JANE DOE. He always got along well with her. They played games and went on walks together. If JOSEPH was at L.S.'s residence sleeping in the bedroom, JANE DOE stayed in the living room. If JOSEPH was sleeping in the living room, JANE DOE would stay in the bedroom with L.S.

38.     JOSEPH was surprised when he was told that JANE DOE was the person who made the accusation against him. JOSEPH thought JANE DOE was making up the accusation against him, but he did not know why. He denied repeatedly that he would ever touch JANE DOE "in that way." JOSEPH also denied touching JL.J. on the backside, on her buttocks, on her legs, or on her breasts.

39.     The interview with SA Drace and CI Dale was the first time JOSEPH became aware of any accusations made against him. After JOSEPH was admonished to be truthful, JOSEPH said he would drive around with JD.J. JOSEPH admitted that he had sex with JD.J because she wanted money. JOSEPH initially stated that he had sex with JD.J. in November 2020, when JD.J. would have been seventeen. JOSEPH did not remember the exact date, but knew it was some time in November.

40.     JOSEPH reported that the first time he had sex with JD.J., she came onto and made the move on him. JOSEPH did not ask her for sex. He did not remember when this happened. He had given her

money so many times before and they did not have sex. He did not know why JD.J. wanted to have sex this time. On an unspecified date outside the hospital compound, JD.J. asked JOSEPH, "Do you want to have sex for 20 dollars?" JOSEPH did not tell JD.J. to have sex with him for money.

41.     The first time JOSEPH had sex with JD.J. they were outside on the ground by the windmill at the top of the hill east of Ganado. The windmill was located past the turnoff to Ganado lake and past the airport. There were trees next to the windmill. They had sex three other times in the same spot inside JOSEPH's truck. JOSEPH reported he had "regular" intercourse with JD.J., with his penis in JD.J.'s vagina. He would sometimes touch the rest of her body including her breasts with his hands. JD.J. would take her clothes off, but JOSEPH would keep his clothes on.

42.     JOSEPH estimated that they had sex one time in the last six months in either September 2020 or October 2020. Prior to that, he thought they had sex three times, but no more than four times total. Between June 2020 and September 2020, they "had sex off and on." JOSEPH had sex with JD.J. on his days off. She asked him when his days off were and then asked if he would come over. JD.J. was the one always coming onto JOSEPH. She started everything, but he was able to resist her advances. They only had sex five times.

43.     JOSEPH advised that JD.J. sent him text messages about having sex. The text messages from JD.J. told JOSEPH that she needed money. She last sent JOSEPH a message like that in approximately August 2020. JD.J. told JOSEPH to delete the text messages, so they were not available to be reviewed at the time of the interview.

44.     JOSPEPH initially verbally consented to a search of his physical cellular device, believed to be the Target Telephone. JOSPEPH retracted his consent after it was advised that the contents, including conversations not pertinent to the investigation, may be downloaded, and reviewed.

45.     JOSEPH advised that his current phone number was (928) 206-0708. His previous telephone number that he used when communicating with JD.J. between June 2020 and September 2020 was (928) 206-1308. JOSEPH changed his phone number approximately a week prior to the interview because of the

number of spam calls he was receiving.  JOSEPH advised that his physical cellular telephone was purchased and provided by an individual determined to be P.B. approximately one year prior to the interview.  Further, JOSEPH advised that while he changed his contact phone number, he utilized the same physical cellular device.

### Search warrant to Cellular One

46.     Pursuant to search warrant in 21-5064MB from the United Stated District Court for the District of Arizona for information associated with cellular telephone number (928) 206-1308, held by provider Cellular One (hereinafter The Provider) between June 1, 2020 and October 31, 2020.

47.     On April 20, 2021, The Provider responded to the search warrant and provided historical call detail connection records, which included records of SMS and MMS transmissions. No content for the SMS or MMS transmissions was available.  The Provider identified International Mobile Equipment Identity (hereinafter IMEI) as number 355127090550023 for the Target Telephone number. The provider also identified the subscriber to be P.B. of Kinlichee, Arizona.

### Grand Jury Subpoena

48.     On June 17, 2021, results from a subpoena provided to Cellular One revealed that IMEI number 355127090550023 was associated with the Target Telephone number (928) 206-1308, subscribed to by P.B. The Target Telephone remained in use until June 14, 2021 and believed to be in the possession of JOSEPH. After this time, service was terminated.

### Technical Background

49.     Based on my training and experience, in some cases communications occur using cellular devices and these cellular devices contain evidence of a crime or motivations for committing a crime. Additionally, these conversations can occur hours, minutes, days, weeks or months prior to the crime.  This includes but is not limited to text message communications, telephone calls, and email communications.

50.     Based on my training and experience, I also know that a cellular device has the capabilities that allow it to serve as a wireless telephone, digital camera, portable media player, GPS navigation devise,

PDA, tablet, and has the capability to access the Internet and has an IP Address. A cellular device has the capability to store large amounts of data on the memory located in the physical device. This data includes, but is not limited to pictures, e-mail communications, text message communications, application data, and other information stored in an electronic format.

51.    Based on my training and experience, I also know that those involved in committing a crime use cellular devices to aid in their escape or communicate information related to the crime they committed. This includes but is not limited to text message communications, telephone calls, and email communications.

52.    Based on the these facts, your Affiant believes that on the device memory located inside the cellular device as described fully in Attachment A, there will be application data, text message communications, and other evidence (more fully described in Attachment B) that constitute evidence of a crime, contraband, fruits of a crime, or other items illegally possessed, and property designed for use, intended for use, or used in committing a crime.

53.    Searching the device for the evidence described may require a range of data analysis techniques. In some cases, it is possible for Agents to conduct carefully targeted searches that can locate evidence without requiring a time-consuming manual search through unrelated materials that may be commingled with criminal evidence. For example, Agents may be able to execute a "keyword" search that searches through the files stored in a computer for special words that are likely to appear only in the materials covered by a warrant. Similarly, Agents may be able to locate the materials covered in the warrant by looking for particular directory or file names. In other cases, however, such techniques may not yield the evidence described in the warrant. Criminals can mislabel or hide files and directories; encode communications to avoid using key words; attempt to delete files to evade detection; or take other steps designed to impede law enforcement searches for information. These steps may require Agents to conduct more extensive searches, such as scanning areas of the device's memory not allocated to listed files, or opening every file and scanning its contents briefly to determine whether it falls within the scope of the

warrant. In light of these difficulties, your Affiant requests permission to use whatever data analysis techniques appear necessary to locate and retrieve the evidence.

54.     Analyzing electronic devices for criminal evidence is a highly technical process requiring expert skill and a properly controlled environment. Such devices utilize a vast array of different operating systems, software, and set-ups. The variety of hardware and software available requires even experts to specialize in some systems and applications. Thus, it is difficult to know prior to the search which expert possesses sufficient specialized skill to best analyze the system and its data. No matter which system is used, however, data analysis protocols are exacting scientific procedures, designed to protect the integrity of the evidence and to recover even "hidden," erased, compressed, password-protected, or encrypted files. Since electronic evidence is extremely vulnerable to tampering or destruction (both from external sources and from destructive code imbedded in the system as a "booby trap"), a controlled environment is essential to its complete and accurate analysis. Furthermore, there are often no software tools designed for forensic searches of particular electronic devices. For the foregoing reasons, the Target Telephone may be removed from its current premises if Agents deem it necessary in order to conduct an efficient, complete, secure, and accurate search of the device.

### Electronic Storage and Forensic Analysis

55.     In my training and experience, I know that electronic devices can store information for long periods of time.  Similarly, things that have been viewed via the internet are typically stored for some period of time on the device.  This information can sometimes be recovered with forensic tools.

56.     In my training and experience in this case and others, an electronic device may be used to conduct support or facilitate criminal activity.  The electronic device is an instrumentality of the crime because it is used as a means of committing the criminal offense.  The electronic device is also likely to be a storge medium for evidence of crime.

57.     From my training and experience, I believe that an electronic device used to facilitate criminal activity as described herein may contain: data that is evidence of how the electronic device was used; data or other communication that was sent or received; and other records that indicate the nature of the offense.

58.     Additionally, I know that text, data, and multimedia can be stored on a wireless device.  In my experience, individuals that may have been involved in criminal activity attempt to hide potentially incriminating communications, photos, videos, and similar media to evade detection.  However, I am aware that previously deleted communications or media may be recovered through proper forensic analysis and recovery.

59.     In my training an experience, I have learned that while a provider has limitation on record retention, a mobile cellular device is generally not subject to such limitations.  It is known to me that cellular phones and similar such devices can contain a variety of information concerning communications and media regarding crimes committed such as those described in the Affidavit.  Those records may include: a) text or SMS messages, instant messages, or multimedia messages or MMS messages between an offender and a victim; b) historical call detail records for WiFi based communications applications that may not otherwise be reflected in the provider's historical connection detail records; c) frequently called phone numbers, favorites, or speed dial numbers, which may include phone numbers of previously unidentified contact phone numbers of victims; and, among other things, d) notes that may be kept in a digital format on electronic devices concerning criminal activity.

60.     Nature of examination: Based on the foregoing and consistent with Rule 41(e)(2)(B), the warrant I am applying for would permit the examination of the device consistent with the warrant.  The examination may require authorities to employ techniques, including but not limited to, computer-assisted scans of the entire device that might expose many parts of the device to human inspection in order to determine whether it is evidence described by the warrant.

61.     Information on the Target Telephone in the possession of JOSEPH may also help establish whether crimes were committed or otherwise corroborate information that may help substantiate claims made by JD.J. or JOSEPH.

## **CONCLUSION**

62.     Based on the aforementioned factual information, I respectfully submit that there is probable cause to believe that evidence described in Attachment B, is located within the Target Telephone, as more fully described in Attachment A, and will support an investigation related to a violation of 18 U.S.C. §§ 1153, 2241, and 2243(a). Thus, your affiant respectfully requests the issuance of a search warrant of the physical cellular telephone in possession of JOSEPH for the things as described in attachment B.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Dated:_____July 12, 2021_____        _____
                                        Special Agent Dustin Blazer Drace
                                        Federal Bureau of Investigation

Telephonically subscribed and sworn to before me this ___12___ day of July, 2021.

Honorable Michelle H. Burns
United States Magistrate Judge
District of Arizona